ALASKA CENTER FOR THE ENVIRONMENT; Northern Alaska Environmental Center; Southeast Alaska Conservation Council; Trustees for Alaska, Plaintiffs–Appellees,

v.

Carol M. BROWNER,* Administrator, United States Environmental Protection Agency; EPA Region X; Dana A. Rasmussen, Regional Administrator, Defendants–Appellants.

No. 92–36825.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 31, 1994.

Decided March 30, 1994.

---

* Carol M. Browner, the current Administrator of the EPA, is substituted for the former administrator William K. Reilly. *See* Fed.R.App.Pro. 43(c)(1).

John A. Bryson, U.S. Dept. of Justice, Washington, DC, for defendants-appellants.

Michael M. Wenig, Trustees for Alaska, Anchorage, AK, and Ronald Wilson, Columbia, MO, for plaintiffs-appellees.

Before: GOODWIN, SCHROEDER, and NORRIS, Circuit Judges.

SCHROEDER, Circuit Judge:

This is a citizen suit brought under the Clean Water Act ("CWA" or "Act") to compel the Environmental Protection Agency ("EPA") to implement the Act's provisions requiring the EPA to establish total maximum daily loads ("TMDLs") for Alaskan waters in order to achieve desired standards of water quality. Plaintiffs in this suit are four environmental organizations and their members (collectively, "ACE") who have alleged that they use Alaskan waters and are adversely affected by the EPA's failure to establish the required TMDLs. The district court issued an injunction aimed at bringing about EPA compliance with the Act. The EPA appeals, challenging plaintiffs' standing and certain remedial aspects of this injunction order. We affirm.

## I. *Background.*

The background of this action and the statutory scheme of the CWA are excellently summarized in the district court's first published opinion in this case granting partial summary judgment in favor of the plaintiffs and holding that the EPA was in flagrant violation of the mandatory requirements of the Act. *Alaska Center for the Environment v. Reilly*, 762 F.Supp. 1422 (W.D.Wa.1991)

("*ACE I*"). As the district court explained, the CWA was passed in 1972 to "'restore and maintain the chemical, physical·and biological integrity of the Nation's waters.'" 762 F.Supp. at 1424 (quoting the CWA, 33 U.S.C. § 1251). Its laudable but unattained goal was to eliminate the discharge of pollutants into navigable waters by 1985. *Id.*

To aid in enforcement of the Act, § 505(a) authorizes citizens to bring suit in federal court against the EPA for failing to perform a mandatory "act or duty" set forth in the CWA. 33 U.S.C. § 1365(a). The plaintiffs filed this suit pursuant to that section, alleging that the EPA had not performed mandatory duties under the statute to protect the waters of Alaska from further degradation. In their successful motion for partial summary judgment, plaintiffs demonstrated that the EPA had engaged in a pattern of total inaction in carrying out its duties under the CWA that extended over a period of approximately 12 years.

The provisions of the CWA at issue in this lawsuit set forth a specific process for attaining an acceptable water quality level in areas where technology-based methods of combating pollution from specific point sources have proven inadequate. Under the statutory scheme, states are required to identify the specific waters that remain polluted despite the point source controls, and designate them as "water quality limited." These states are then required to establish a priority ranking for their water quality limited segments, and establish TMDLs, the maximum amount of pollutants a water body can receive daily without violating the state's water quality standard, according to that ranking. 33 U.S.C. §§ 1313(d)(1)(A), (C). The Act requires the states to develop these lists of water quality limited segments and TMDLs and submit them to the EPA periodically; however, the first such submission was due no later than June 26, 1979.[1]

Upon receipt of the state's listings, the CWA requires the EPA to review the state's submissions within 30 days and either approve or disapprove them. If the EPA disapproves of the state's identification of water quality limited segments or its listing of TMDLs, the agency must establish its own list of water quality limited segments and TMDLs within 30 days. 33 U.S.C. § 1313(d)(2).

The record before the district court showed that the State of Alaska had never submitted any TMDLs to the EPA, and that the EPA had done nothing to establish any TMDLs. Relying on the Seventh Circuit's decision in *Scott v. City of Hammond*, 741 F.2d 992 (7th Cir.1984) (cited with approval in *City of Las Vegas v. Clark County Nevada*, 755 F.2d 697, 703–04 (9th Cir.1985)), the district court held that the State of Alaska's failure to submit the TMDLs for over a decade amounted to a "constructive submission" of "no TMDLs," thereby triggering a mandatory duty on the EPA's part to promulgate TMDLs. 762 F.Supp. at 1426–29. Rejecting the EPA's contention that its duty was not "mandatory," the district court pointed out that

> Congress' repeated use of the term "shall" in section 303(d) clearly places a mandatory duty upon the EPA to take affirmative action after disapproving a state's unacceptable submission. Read in light of common sense and the fact that Congress set out such short time lines in this section, ... Congress intended that EPA's affirmative duties be triggered upon a state's failure to submit a list or any TMDL at all.

*Id.* at 1427. The district court then quoted with approval the Seventh Circuit's reasoning in *Scott:*

> "We cannot allow the states' refusal to act to defeat the intent of Congress that TMDLs be established promptly—in accordance with the timetable provided in the statute. In addition, to construe the

---

**1.** 33 U.S.C. § 1313(d)(2) provides that "each state shall submit ... [TMDLs] to the administrator from time to time, with the first such submission not later than 180 days after the date of publication of the first identification of pollutants under section 1314(a)(2)(D) of this title." June 26, 1979, fell 180 days after the date of publication of the first identification of pollutants under § 1314(a)(2)(D).

relevant statute (any other way) would render it wholly ineffective. There is, of course, a strong presumption against such a construction."

*Id.* (quoting *Scott,* 741 F.2d at 998). The court reserved the question of the precise remedy to be ordered for a later decision.

Following the district court's decision on the merits, plaintiffs moved to compel the EPA to perform specific mandatory duties under the CWA. In response, the EPA moved for partial summary judgment, seeking to limit the scope of the district court's remedy. The motion challenged the plaintiffs' standing to support the requested state-wide remedy on the ground that plaintiffs had demonstrated injury only with respect to a limited number of streams within the state.

The district court denied this challenge to standing in an unpublished decision, determining that the defendants had confused the standing requirements of injury in fact and redressability with the ultimate scope of the court's remedy. The district court also denied a subsequent, belated challenge to the plaintiffs' standing to maintain the suit at all, based on the allegedly improper use of hearsay interrogatory answers to establish injury in fact.

In June of 1992, the district court entered its order setting forth the remedy deemed necessary to cure the EPA's deficiencies. *Alaska Center for the Environment v. Reilly,* 796 F.Supp. 1374 (W.D.Wa.1992) (*"ACE II "*). In pertinent part, the district court ordered:

(3) within 90 days of the EPA's approval or disapproval of Alaska's list of water quality limited segments, the EPA shall propose a schedule for the establishment of TMDLs for all waters designated as water quality limited;

(4) within one year of the EPA's approval or disapproval of Alaska's list of water quality limited segments, the EPA shall submit to the court its report on ambient water quality monitoring; [and]

(5) within 30 days of the submission of the report, the EPA shall propose a schedule

for the implementation of those measures identified as appropriate and practicable in its report.

796 F.Supp. at 1381.

The EPA in this appeal does not challenge the district court's holding in *ACE I* that the EPA is in violation of the mandatory requirements of the CWA. The EPA does seek review of the district court's unpublished rulings on standing, and the aspects of the district court's published order of injunctive relief quoted above.

## II. *Standing.*

■ Plaintiffs have sought and received from the district court an order requiring state-wide compliance with the Clean Water Act. In order to establish standing to bring a particular suit, a plaintiff must prove (1) a concrete, particularized injury in fact; (2) a "causal connection between the injury and the conduct complained of"; and (3) that the injury is likely to be redressed by a decision in the plaintiff's favor. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The EPA argues that the plaintiffs here have failed to prove "injury in fact" with respect to most of the specific water bodies in Alaska, and that the plaintiffs' injuries are not likely to be redressed by a favorable decision in this case.

■ First, the EPA argues that even if it is required to establish TMDLs, the actual quality of Alaskan waters will depend in part upon discretionary acts of the State of Alaska with respect to non-point source pollution. The EPA cites *Fernandez v. Brock,* 840 F.2d 622 (9th Cir.1988) to contend that plaintiffs' relief is contingent on the acts of a third party not before the court, and that the redressability requirement of standing is not met. This argument is untenable, because Congress has determined that the relief plaintiffs seek is the appropriate means of achieving desired water quality where other methods, including non-point source controls, have failed.

In *Fernandez,* plaintiffs were migrant workers seeking a court order to force the Secretary of Labor to establish regulations that might affect their eligibility for retirement benefits. However, because any increase in the benefits for which plaintiffs would be eligible was entirely contingent upon the actual content of the regulations the Secretary would ultimately establish, as well as the actions of plaintiffs' private employer, the court could not say with any degree of confidence that granting the plaintiffs their requested relief would benefit them.[2] *Id.* at 626–28. Here, by contrast, third party involvement does not render the relief sought completely speculative. Congress and the EPA have already determined that establishing TMDLs is an effective tool for achieving water quality standards in waters impacted by non-point source pollution.

■ The EPA next argues that plaintiffs have established "injury in fact" only with respect to the streams that plaintiffs are able to establish that they use. As the district court observed in its well-reasoned unpublished order on standing, "in sum, the EPA contends that plaintiffs must allege a member's diminished use and enjoyment of every water body that would be affected by the state-wide TMDLs program." The district court went on to note that in light of Alaska's estimated 3,000,000 lakes, 170,000,000 acres of wetlands, 365,000 miles of rivers and streams, and 36,000 coastal miles, this would be a heavy burden.

The district court correctly concluded that plaintiffs need not shoulder such a burden. Plaintiffs established that they were adversely affected by the inadequate water quality of a representative number of waters throughout the state of Alaska. Their injury is the result of EPA's failure to comply with the CWA to establish TMDLs for the State of Alaska; the CWA imposes no narrower obligation. *See* 33 U.S.C. § 1313(d)(2) ("If the administrator disapproves [the State's identification of TMDLs], he shall ... identify

such waters *in each state....*" (emphasis added)). In addition, it is significant that the remedial scheme of the CWA not only requires the EPA to establish TMDLs but to do so on a prioritized basis throughout the state, "taking into account the severity of the pollution and the uses to be made of such waters." 33 U.S.C. § 1313(d)(1)(A). Hence, for CWA regulatory purposes, all waters within a state are interrelated. It would be contrary to congressional directive to permit individual plaintiffs or a federal court to deal with only a fraction of the waters and, in effect, impose their own prioritization upon the EPA by limiting the scope of an ordered remedy to specific streams of paramount concern to the parties before the court.

We agree with the district court that "the appropriate scope of the remedy goes to the merits of plaintiffs' claims and is ultimately limited by the statutory authority for judicial action," and that the plaintiffs here have "demonstrated 'actual injury' sufficient to present the legal questions at issue in a 'concrete factual context' of water pollution in Alaska" as the standing requirement is meant to ensure.

In this context, the EPA's reliance on *Conservation Law Found. v. Reilly,* 950 F.2d 38 (1st Cir.1991), is not only misplaced, but underscores the inevitability of state-wide relief in this case. In *Conservation Law,* the First Circuit ruled that a conservation organization that showed that its members were injured by the EPA's inaction with respect to ten federal hazardous waste sites in New England was not entitled to nation-wide relief. The court reasoned that because the plaintiffs had no members in a majority of the regions in the country, the case lacked a "concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Id.* at 43. For this reason, the court refused to grant the nation-wide relief sought by the Conservation Law Foundation, which would have required ordering hundreds of discrete and separate evaluations on

---

**2.** The court ultimately held that the plaintiffs had standing as a result of a "procedural injury" that existed apart from any reduction in benefits, and that would be redressed by requiring the Secretary to establish the desired regulations. *Id.* at 631.

the part of hundreds of separate EPA regional offices.

By contrast, the relief ordered in this case involves the action of a single EPA office and the performance of a precise duty—to establish TMDLs for the State of Alaska—mandated by statute. Unlike the plaintiffs in *Conservation Law*, plaintiffs in this case have also demonstrated representation and injury throughout the entire area for which they seek relief. Most importantly, as noted above, the statutory provisions in this case direct the EPA to establish TMDLs within Alaska in a prioritized order, upon consideration of specific factors. To limit relief in this case as the First Circuit did in *Conservation Law*, then, would unduly interfere with the statutory scheme established by Congress. The *Conservation Law* court faced no such concern.[3]

■ The EPA's remaining standing contention requires no extensive discussion. In an EPA reply memorandum filed in the district court after the plaintiffs had responded to the EPA's Motion for Reconsideration of *ACE II*, the EPA for the first time argued that plaintiffs' interrogatory answers were inadequate to establish plaintiffs' injury, and thus standing, with respect to any Alaskan waters. The district court acted well within its discretion in rejecting the EPA's belated challenge to the sufficiency of the formal state of the record. The federal rules specifically authorize the use of interrogatory answers in summary judgment practice, and any objection to their use in this case should have been made at the summary judgment stage, not after a final judgment had been entered. *See United States v. Western Electric Co.*, 337 F.2d 568, 575 (9th Cir.1964) (refusing to disregard "declarations" not in compliance with Rule 56(e) in reviewing a grant of summary judgment, when no timely objection had been made).

### III. *Remedy.*

■ In its published opinion in *ACE II*, the district court explained the remedial action it ordered, fully addressing the same contention the EPA raises in this appeal. The EPA argues that the district court exceeded its remedial powers under § 505 of the CWA when it ordered the EPA "to submit to the court its report" on the adequacy of water quality monitoring in Alaska, and to "propose a [long-term] schedule for the establishment of TMDLs" for Alaskan waters. *ACE II*, 796 F.Supp. at 1381. The EPA stresses that the language of the CWA does not specifically require it to prepare or present a report on water quality monitoring, and further contends that the statute relegates the pace at which TMDLs shall be established entirely to the EPA's discretion.

The district court has broad latitude in fashioning equitable relief when necessary to remedy an established wrong. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). In this case the established wrong is the failure of the EPA to take any steps to establish the TMDLs mandated by Congress for more than a decade. In tailoring the relief granted, the district court correctly recognized that in order to bring about any progress toward achieving the congressional objectives of the CWA, the EPA would have to be directed to take specific steps. In selecting the remedy that it did, the district court acted with great restraint in requiring only that steps undeniably necessary to the development of TMDLs in Alaska be accomplished by deadlines that are far more lenient than those contained within the CWA itself.

While issuing these general directives to ensure ultimate compliance with the CWA, the court was careful to leave the substance and manner of achieving that compliance en-

---

3. The EPA also relies on *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) and *PETA v. Dept. of Health and Human Serv.*, 917 F.2d 15 (9th Cir.1990), in support of its contention that ACE lacks standing to seek state-wide relief in this case. Contrary to the EPA's suggestion, however, *Lujan* and *PETA* are not cases in which a court limited the scope of its ordered remedy to the specific areas for which the named plaintiffs could demonstrate injury. Rather, in both of those cases, the courts granted summary judgment in favor of the defendants on the grounds that the plaintiffs had failed to sufficiently allege that they were injured in any way by the defendant's action or lack thereof.

tirely to the EPA. As the court noted with respect to its order that the EPA develop a long-term schedule for the development of TMDLs,

> the court is mindful not to intrude upon the agency's realm of discretionary decision making. The court adopts in full the [memorandum of understanding reached between the EPA and the State of Alaska], and will not disturb the EPA's determination of the appropriate short-term schedule for the study and possible establishment of TMDLs. The court also recognized, however, that standing alone the MOU will not secure faithful compliance with the CWA.

796 F.Supp. at 1379. Similarly, while finding that a report on the efficacy of ambient water quality monitoring in Alaska had become necessary "in light of the EPA's thirteen-year delay in implementing a TMDLs program in Alaska," the district court carefully noted that "the determination of what, if any, water quality monitoring would be both appropriate and practicable is left to the agency's discretion." *Id.* at 1380.

In enacting environmental legislation, and providing for citizen suits to enforce its directives, Congress can only act as a human institution, lacking clairvoyance to foresee the precise nature of agency dereliction of duties that Congress prescribes. When such dereliction occurs, it is up to the courts in their traditional, equitable, and interstitial role to fashion the remedy. This the district court has done in a manner we cannot fault.

AFFIRMED.